Mr. Lim's immigration status is anything but uncertain. As he sits here today, he is a legal, permanent resident. He came to this country as an LPR, was ordered deported, but when the Board of Immigration Appeals re-opened his case, it restored him to LPR status. and vacated his deportation order. It is settled law that when an LPR seeks 212C relief and the BIA re-opens the case, the deportation order is vacated as if it never occurred. The retroactive application is crucial because it restores previously illegal presence in the country as though it was legal, and in the immigration context, it allows that LPR to recoup the time that he was here towards lawful domicile. The 7th, the 9th, and the 10th circuits have all recognized this, and the Supreme Court recognized that this was the Solicitor General's position in the Ken v. Holder. There is no circuit split on this issue. There is no law to the contrary, and that's because DHS has not appealed these rulings. Everybody agrees that this is the effect of a BIA order that re-opens the case. That it is vacated, and that it is retroactive. And so the point here is that in order to give retroactive effect to Mr. Lim's LPR status, this Court does not have to strike out new case law, and it does not have to adopt Bonilla. This is a subtle practice of immigration procedure. The prosecution offers no authority that this Court should ignore the retroactive application of the BIA ruling in restoring Lim's LPR status. So there's no reason why we should treat it one way in the immigration context and another way in a criminal context. And so there's no compelling reason to not treat the restoration of Lim's LPR status as retroactive for this criminal prosecution. Even the principal legal advisor at Homeland Security, who examined this case, agreed and found that the BIA ruling reopening his case restored LPR status. It did so retroactively, and that Lim could not be prosecuted. And if you look at this circuit's case law, the same result should be reached. Oriana, Flores, Lucio, Araui, Garcia, Arrieta, all of these Fifth Circuit cases show the application of immigration law and its consequences in the context of a 922 G5A prosecution. And so what the Court did in each of those cases is it examined the defendant's immigration status and what the consequences are of where that defendant was in the process. The reason we're here today is because no one of those cases presents an identical scenario as Mr. Lim's case. We have Oriana and Garcia. Those found that TPS and SIJ status gave the defendant legal presence as far as 922 G is concerned. Mr. Lim has LPR status. That is a superior status to TPS and SIJ. The remaining cases discuss the fact that we had a pending application that did not alter the status, and that even if that pending application was granted, it would not make the previously illegal presence legal. But that's not the case for Mr. Lim. His legal status was restored retroactively, and that made his previously illegal presence legal. I would also note that Mr. Lim's case is extraordinary and it's rare. It is not common for the Board of Immigration Appeals to reopen these proceedings. A situation like the one in Mr. Lim's case is going to be limited to applications for 212C relief from immigration cases occurring between 1996 and 2001 that concerned a deportable criminal offense. So there's nothing about a ruling from this court that would open the floodgates to a lot of claims because this is a very rare procedural scenario. So again, we have a situation where we have no law and no sound policy rationale to treat the effect of the Board of Immigration Appeals proceedings as retroactive for immigration cases, but not retroactive for criminal cases. And so with regard to the first issue on appeal, this court should apply the settled immigration law, just as it has in other cases, give retroactive effect to the restoration of Mr. Lim's LPR status, and dismiss the indictment because Mr. Lim is an LPR who is legally entitled to possess firearms. And if you don't have any questions on that issue, I would like to move to the search warrant for the issue of the search issue. So with regard to the search, we have no dispute that this was a custodial arrest. Mr. Lim answered the door, he complied with the officer's request to step outside, even though he was not dressed, and then the agents handcuffed him behind his back. They did not perform a search incident to arrest. They asked him if he would like to get dressed, but that if he wanted to go inside and get dressed, they would have to accompany him. That was the entire scope of their request. If you want to get dressed, we have to come inside. He agreed and said yes, I'd like to get dressed. There was no request to search. There was no request to look, take a look around. It was simply, if you want to go put some clothes on, we've got to come with you. How many of the officers went in at that time? All of them. Was there seven? It appears that the testimony is slightly inconsistent. I believe there was six, possibly seven. And it was dark? It was 6 a.m. in the morning, and that would have been in March. So, yes, I believe it still would have been dark outside at that time. And if you'll look at the transcript of the evidence you're hearing, there is no testimony about a consent to search. All of the testimony is about a consent to enter, and those are two very different things. Upon arrest, no Miranda warnings were given. And for this case, we don't need to look at why Miranda warnings weren't given. We do not need to consider the exceptions to the Miranda rule because Officer Randall tells us why Miranda warnings weren't given, and it's because he says, I don't care about Miranda. My case is over, and that's in the record at page 765. So Randall moves Lim inside where the officers outnumber the family by about six to four. There were four family members, including Mr. Lim. We think at least six officers. Once Randall moves Lim inside, he asks, are there any guns in the house? And also the record is clear that this question was posed to Mr. Lim and not Mr. Lim's wife. That's in the record at page 743, and Lim provides the answer, yes, there's two guns in the home. At about the same time that Officer Randall is questioning Mr. Lim and then moving him into the bedroom where one of the guns is, the rest of the officers begin to perform a protective sweep, and that protective sweep eventually progresses to a full-blown search of the home. And the prosecution's reliance on the protective sweep is misplaced in this case for three reasons. The first is the purpose of the protective sweep is to find persons, not guns. The second is that the Mendes criteria for the sweep has not been met here. There's no reasonable articulable suspicion that the home harbored a dangerous individual. There's no testimony in the record about dangerous individuals being present in this home. And then finally, there's no support in the record for a consent to sweep. There's a lot of discussion in the government's brief about it, but again, a careful review of this evidentiary hearing, the furthest they get for the consent to sweep is a hearsay statement that they believe Officer Jenkins obtained consent, but the follow-up question was never asked. Who did he ask and what was the response? So there's no support for this consent in the record. So what we know is that we went from a protective sweep to a search, and the reason that we know that it progressed from a protective sweep to a search is because the officers began looking in places that were too small to harbor a human, and that's when the guns were found. And so now we have a warrantless search, no consent for the search, which means we have a presumptively unreasonable search. In total, we've got a custodial arrest followed by a failure to give Miranda for an invalid reason. We have unwarranted questions that elicit an incriminating response. Meanwhile, at the same time that's going on, we have a protective sweep that advances to a search without a warrant or consent for either, and the recovery of contraband as a result of that warrantless search. And all of this is far beyond the scope of Lim's consent that the officers could accompany him inside so he could put on clothing. So our request here is that this court suppress the statements that were made in response to the un-Mirandized questioning, this court suppress the guns that were seized in response to the warrantless search, and that this court suppress the post-Miranda statements because they recapitulate the pre-Miranda statements. And if this court has any further questions, I'll— Mr. Latsos. Good morning, Your Honors. May it please the Court, Spiro Latsos for the government. Your Honors, with regard to the status issue, the government strongly disagrees with appellate counsel's interpretation of the Bonilla case. The Bonilla ruling only applies in the immigration context. It does not apply in 922G cases. The Bonilla case and no other case addressing that issue has said that the cancellation of a removal order pursuant to a 212 relief filed in an immigration proceeding somehow retroactively cancels an already committed crime. It didn't retroactively pardon him. So when Mr. Lim had his removal orders— We, of course, aren't bound by the rulings of other circuits, but under those rulings, would the government still prevail or would it not? Yes, the government would still prevail under the case law that's already there. And what this court should look to is the cases like Loose Hill and El Rawe, which the government argues is controlling here. And what those cases say is that we look at the defendant's status at the time he committed the crime. And Mr. Lim's status was that he was an illegal alien on the day he was caught possessing those weapons. So what's your strongest Fifth Circuit case for that? Both Loose Hill and El Rawe. And so, again, Your Honor, the court needs to look at the snapshot in time. Mr. Lim's status was not transformed until after he was caught with the weapons and after he was indicted when he filed for 212C relief. And the court has gone on to say, furthermore, that if someone has an impediment and is a prohibited person for one reason or another, that in the Hicks — in the U.S. v. Hicks and U.S. v. Chambers decisions, this court has said that those individuals need to fix their status before they acquire weapons. And Mr. Lim had an opportunity to do that. He was on the lam for — since 1999 for almost 15, 16 years, and he didn't do that. He only did that after the fact. And so he didn't transform his status until after the fact. So those cases control, Your Honor. And in terms of 212 relief, I'll just say this. When the St. Cyr decision came out and the decisions that followed, the immigration courts didn't go back and automatically cancel all of the removal orders for individuals that were eligible for 212C relief. An individual that wants 212C relief must file an I-191 form with USCIS to start the process, and they have to show a variety of things to show that they're eligible. And, again, that is an affirmative step that they have to take to get that relief. And Mr. Lim, again, only did that after he was caught in possession of his weapons and after he was charged in the indictment. Now, I see there are no other questions on that topic, so I'll move on to the search issues. Your Honor, the government's position is that this search was constitutional because Mr. Lim gave consent and because the officers had a right to do a protective sweep. I'll address the protective sweep issue first. What we have here is, as this court, in the Booy decision, which has laid out the proper guidelines for a protective sweep, we have here the agents had a legal right to be at the house. They had a valid arrest warrant from Mr. Lim. And the testimony of Mr. Lim's children also, in addition to the testimony that came from the officers, everyone agreed that Mr. Lim let them come in the house so that he could dress. Well, that's somewhat different than a protective sweep on their own initiative. Right, but they had the right to get into the house. And at that point, they also, for officer safety, had a right to ask if there were weapons, and that's what piqued their interest. And so when they went in, they started looking in the rooms adjoining the main room in order to see who else was in the house because people were coming into the room where they were. And so they didn't know who was there. They were alerted that there were weapons in the house at the same time, so they wanted to do a protective sweep to make sure that there were no other harmful people that were going to do harm to them in the other rooms. And also the sweep was only a short check of the bedrooms for people and for the guns. And that can be found on page 746, 780, and 781 of the record. What do you do with the position of counsel opposite that there is a difference between guns and people when it comes to a protective sweep? Well, it's my understanding that they're looking for people, that they need to look for people. But, I mean, if these people are armed or they have access to weapons, then they should be able to go secure those as well. Opposing counsel said there's no support in the record for consent to the sweep. And you say what? Well, in terms of the consent, first of all, Mr. Lim agreed that there was consent in his factual basis. And then we have the testimony of the two officers who testified at the suppression hearing that their partner, Special Agent Reed Jenkins, asked for consent, and they both said that they heard him ask for consent. And so you have that support for that. But, again, he admitted it in his factual basis, and this was a negotiated factual basis where he admitted that he consented to the search. And, furthermore, in terms of the search, in terms of the consent, there were no threats or coercive tactics here by the officers, and they testified that too on page 748 of the record. And the children also said, page 800, 801, and 810, that guns were not drawn and they were not threatened in any way. And, furthermore, it's clear that Mr. Lim nor any of his families ever objected to the search. So, seeing that there are no other questions at this time, I will defer to our brief, and I ask that this Court affirm the conviction. Thank you, Your Honors. Thank you, Mr. Latsos. Ms. Johnson, you've saved time for a vote. Very briefly, Your Honors. Regarding the government statements about the applicability of Lucio and El-Rawi to this case and how this circuit has looked to the defendant's status at the time of the commission of the crime, in both of those cases, this circuit very carefully examined immigration law and procedure, and particularly with regard to El-Rawi and his later application to become or to obtain a green card because he married a U.S. citizen. And they looked at that and they said, but the point is, even if he obtains this, it's not going to change the fact that he was previously here illegally, and that is what distinguishes the Lim case, is that the BIA proceedings restored his status retroactively. I would also point out, counsel made a comment that Mr. Lim was on the limb for 15 or 20 years, and the record is very clear that Mr. Lim did not know that he was subject to an order of deportation. And I would point out to this court that Mr. Lim was a recipient of one of those original or the older green cards that did not expire, that did not need to be renewed every 10 years, and so that's why he wasn't aware that there was a problem. And I would also point out that one thing that makes Mr. Lim's case particularly distinguishable from this circuit's case law is the fact that Mr. Lim was not arrested while he was committing a crime with a firearm. He was arrested on an immigration offense. He was not in the process of committing a crime in the way that many of these other cases were. With regard to the search, the government states that the officers were within their rights to ask Mr. Lim if there were weapons in the home. It provides no authority for that assertion. While it is true that Mr. Lim agreed and gave consent for them to enter the home, that was it. There was no consent to search, and there was no consent to un-Mirandize questioning. The government also claims that as part of the search, it tries to expand the search by explaining that it needed to search for guns because once it found out that there were guns and while it was doing the protective sweep, it needed to make sure that the people in the home didn't have access to the firearms. That is flatly contradicted by the record. By the time these officers started the search, all of the individuals were seated in the living room. They were secured. And if there was such a concern for safety, why on earth would Officer Randall take Mr. Lim into the very room where he already knew that the gun was? It doesn't add up based on the record at all. The comment about the admission in the factual basis is particularly concerning because that presents us with a situation where we have a prosecutor who is putting facts in a factual basis that are flatly contradicted by his officer's testimony and a defense attorney who is permitting his client to sign something that's clearly wrong. So that's teeing up Mr. Lim's 2255 for ineffective assistance of counsel because we have this factual basis that is flatly contradicted by the record. And finally, government counsel points out that nobody in the Lim family home ever objected to a search being conducted. Well, the reason they never objected is because nobody ever asked to conduct a search. And I would just quickly point out a couple of things in the record. The questions about consent to the sweep are found at 751 and 787 that make it clear that it was Agent Jenkins who asked, but nobody heard it, nobody knows who he asked, nobody knows what the response was. And then there is ample testimony in this record to also demonstrate  Officer Bonnet testified at length that they had control of the situation. That's at 783. It was not stressful at all. And at 779-80, he even goes into describing how he was just trying to make small talk with the kids who were getting ready for school, asking the son about whether or not he was on the wrestling team, and he wasn't even paying attention to the investigation that was going on because everything was completely under control. There were no threats. So I would ask this Court to vacate Mr. Lim's conviction because the reopening of the Board of Immigration Appeals proceedings retroactively restored his LPR status, making him not amenable to prosecution under 922G. And the alternative, I would ask this Court to suppress Mr. Lim's unbrandized statements as well as the contraband seized as a result of the warrantless search. Thank you, Ms. Johnson. Your case is under submission. Next case for today, United States, XREL-Rigsby v. State Farm Fire Department.